Roberto **PAGAN,** Jose A. Hernandez and Mateo Colon, Plaintiffs,

v.

Larry E. **DUBOIS,** Commissioner of Correction, Defendant.

Civ. A. No. 95–10675–EFH.

United States District Court, D. Massachusetts.

April 11, 1995.

---

**26**

Roberto Pagan, Shirley, MA, pro se.

Jose A. Hernandez, Shirley, MA, pro se.

Mateo Colon, Shirley, MA, pro se.

General Counsel, Mass. Dept. of Correction, Boston, MA, Larry Dubois, Comm'r of Correction, defendant.

### ORDER

HARRINGTON, District Judge.

The Plaintiffs Pagan, Hernandez and Colon, citizens of the United States, claim that their constitutional rights are being violated by the lack of prison programs at the Massachusetts Correctional Institution at Shirley, by the limited number of Latinos on the staff of the correction system, and by the lack of medical attention and counseling for individuals who are HIV-positive at Shirley, on account of their Latino ethnic background. They seek, pursuant to Rule 23 of the Federal Rules of Civil Procedure, to represent an entire class of inmates of Latino ethnic derivation, whether or not any individual class member was deprived of any personal constitutional right.

The plaintiffs specifically claim that there are no cultural programs available for Latino prisoners at Shirley; that there is only a limited number of Latino staff working with in the prison system resulting in the insensitive treatment of Latino inmates in classification hearings and disciplinary proceedings; and that Latinos, with the HIV virus, do not receive proper medical attention or counseling at Shirley on account of a lack of staff who is able to communicate with such inmates in the Spanish language.

In essence, the plaintiffs are seeking for all Latino inmates special cultural programs and separate administrative and medical facilities on the ground that they are persons of Latin–American origin living in the United States.

The equal protection standard of the Constitution has one clear and central meaning— it absolutely prohibits invidious discrimination by government. That standard must be met by every State under the Equal Protection Clause of the Fourteenth Amendment. *Loving v. Virginia*, 388 U.S. 1, 10, 87 S.Ct. 1817, 1822, 18 L.Ed.2d 1010 (1967); *Hill v. Texas*, 316 U.S. 400, 62 S.Ct. 1159, 86 L.Ed. 1559 (1942); *Strauder v. West Virginia*, 100 U.S. (10 Otto) 303, 307–308, 25 L.Ed. 664 (1879); *Slaughter–House Cases*, 16 Wall. 36, 71–72, 21 L.Ed. 394. (1872).

The cases have made clear that the Constitution is wholly neutral in forbidding any racial discrimination, whatever the race or ethnic origin may be of those who are its victims.

Under our Constitution, the government may never act to the detriment of a person solely because of that person's race. The color of a person's skin and the country of his origin are immutable facts that bear no relation to any quality, condition, or characteristic of constitutionally permissible interest to the government. "Distinctions between citizens solely because of their ancestry are by their very nature odious to a free people whose institutions are founded upon the doctrine of equality." *Hirabayashi v. United States*, 320 U.S. 81, 100, 63 S.Ct. 1375, 1385, 87 L.Ed. 1774 (1943), quoted in *Loving v. Virginia, supra*, 388 U.S., at 11, 87 S.Ct., at 1823. In short, racial discrimination is by definition invidious discrimination.

The rule cannot be any different when the persons injured by a racially biased law are

not members of a racial or ethnic minority. The guarantee of equal protection is "universal in [its] application, to all persons ... without regard to any differences of race, of color, or of nationality." *Yick Wo v. Hopkins,* 118 U.S. 356, 369, 6 S.Ct. 1064, 1070, 30 L.Ed. 220. (1886). See *In re Griffiths,* 413 U.S. 717, 93 S.Ct. 2851, 37 L.Ed.2d 910 (1973); *Hernandez v. Texas,* 347 U.S. 475, 74 S.Ct. 667, 98 L.Ed. 866 (1954); *Truax v. Raich,* 239 U.S. 33, 39–43, 36 S.Ct. 7, 9–11, 60 L.Ed. 131 (1915); *Strauder v. West Virginia,* 100 U.S., at 308. The command of the equal protection guarantee is simple and lucid: In the words of the Fourteenth Amendment: "No State shall ... deny to *any* person ... the equal protection of the laws." Nothing in this language singles out some "persons" for more "equal" treatment than others. Rather, as the Court made clear in *Shelley v. Kraemer,* 334 U.S. 1, 22, 68 S.Ct. 836, 846, 92 L.Ed. 1161 (1948), the benefits afforded by the Equal Protection Clause "are, by its terms, guaranteed to the individual. *[They] are personal rights.* " [Emphasis supplied]. From the perspective of a person detrimentally affected by a racially discriminatory law, the arbitrariness and unfairness is entirely the same, whatever his skin color or ethnic origin.

■ The Equal Protection Clause of the United States Constitution requires that the law be color blind and that no preference nor discrimination be based on race, religion, gender or ethnicity. "Our Constitution is color-blind, and neither knows nor tolerates classes among citizens." *Plessy v. Ferguson,* 163 U.S. 537, 559, 16 S.Ct. 1138, 1146, 41 L.Ed. 256 (1896) (Harlan, J., dissenting).

So long as the Commissioner of Correction administers the Massachusetts Correctional System in a fair and equal manner as to the rights and privileges of all inmates regardless of their ethnic background, the provisions of the Equal Protection Clause of the Fourteenth Amendment are not implicated.

These plaintiffs are citizens of the United States and the Constitution of the United States requires that the law be applied equally to all persons, regardless of race or ethnic origin.

■ Preference or discrimination based on ethnic derivation is, therefore, presumptively unconstitutional. Under our Constitution, any official action that treats a person differently on account of his race or ethnic origin is inherently suspect and presumptively invalid. *Fullilove v. Klutznick,* 448 U.S. 448, 523, 100 S.Ct. 2758, 2798, 65 L.Ed.2d 902 (1980) (Stewart, J., dissenting) (citations omitted). The genius of our democratic form of government and the source of our country's greatness stems from the waves of immigrants always coming to our shores. These immigrants have brought with them their varied cultures which have enriched the American experience and have nourished its civilization in so many areas of life—the making of literature, the creation of music and the arts, the practice of business and the professions, of politics, diplomacy, and fashion. We were all immigrants from many different lands or the descendants of immigrants; but we are now all one people living in this our one country.

As private persons we are all hyphenated Americans who rejoice in our ethnic heritage, celebrate our religious traditions and are justly proud of our ethnic culture's contributions to the American experience.

But the Civil War preserved a Union. *Brown v. Board of Education,* 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954), ruled that the separation of persons by race would no longer be tolerated in this land. The prescriptions of war and law have mandated but one country and one Constitution. Bosnia, amidst the din and carnage of battle, teaches again the old lesson that ethnic divisions are destructive to a society.

As President Clinton said in his inaugural address that the idea of America is "ennobled by the faith that our nation can summon from its myriad diversities the deepest measure of *unity.* " [Emphasis supplied]. E pluribus unum—from many, one.

This Court believes this class suit reflects a creeping "balkanization" of American society into contending ethnic splinter groups which, if allowed to continue, will tear apart the cohesiveness of our social fabric by fanning the flames of accidental ethnic differences. Must the Commissioner of Correction

28

provide Italian, Irish, Russian, Japanese, etc., cultural programs throughout the prison system? Must the staff represent every ethnic group comprising the prison population? The answer is No. The Constitution requires that each prisoner be accorded equal and impartial treatment under the law. The Fourteenth Amendment does not require that the Commissioner of Correction afford inmates any special or separate facilities on account of their ethnic background nor provide a staff reflective of every ethnic group in the prison population. Although it might be prudent for a prison administrator to do so, if it were financially feasible, it is not constitutionally mandated. What is constitutionally required is that no person be discriminated against on account of his ethnic origin.

Plaintiffs seek to represent *all* Latino prisoners. Latinos are persons of Latin–American origin living in the United States.

■ With respect to those claims based on a lack of staff able to communicate with inmates in the Spanish language, plaintiffs' class definition is clearly overbroad. Latino prisoners who speak and write English are not harmed by the conduct. The class sought here would have to be redefined to consist of only those Latino prisoners who cannot communicate effectively in English.

Plaintiffs do not claim that they do not write and speak the English language. Therefore, they do not have "a sufficient stake" in the controversy so as to obtain a judicial resolution of that issue. *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972). Unless plaintiffs have a cause of action in their own right, they cannot be certified as representatives of a class. *Sonsa v. Iowa,* 419 U.S. 393, 95 S.Ct. 553, 42 L.Ed.2d 532 (1975). In fact, it is not clear from the Complaint that the individual plaintiffs themselves have been personally deprived of any constitutional right.

■ With respect to the claim based on the lack of Latino cultural programs, an intra-class conflict appears to arise. The standard of fair and adequate representation requires that plaintiffs have no interests antagonistic to those of the class. *Wetzel v. Liberty Mutual Life Ins. Co.,* 508 F.2d 239, 247

(3d Cir.), *cert. denied,* 421 U.S. 1011, 95 S.Ct. 2415, 44 L.Ed.2d 679 (1975). Yet, Latin–America is a continent comprised of many countries consisting of people of many races and ethnic origins. There is a potential conflict within the proposed Latino class between Latinos who are citizens of Brazil, for example, and Latinos who are citizens of the United States, as are all plaintiffs, and between Latinos whose culture derives from Africa and those whose culture derives from Western Europe. One plaintiff was born in New York City; two were born in Puerto Rico. What Latino culture and history is to be taught and celebrated? The term "Latino" is far too general to be useful in formulating the specific judicial remedy sought here.

I decline to certify the class. However, the prosecution of the individual cases would not create a risk of inconsistent adjudications, but rather would insure that each plaintiff's case is based on its own merits. To this end, I will retain the case to provide the individual plaintiffs the opportunity to establish that their own personal constitutional rights have been violated. If any is able to do so, he shall receive his full remedy in this court consistent with his individual interests.

The Court denies certification of the class under these plaintiffs' Complaint.

SO ORDERED.