Grabau, J.
INTRODUCTION
The Plaintiffs brought this class action seeking declaratory and injunctive relief from conditions resulting from a lock down at Massachusetts Correctional Institution, Cedar Junction (MCI-CJ) which commenced on April 3, 1995. Some preliminary relief was ordered by this court (Chernoff, J.). The Plaintiffs also challenge two policy changes implemented by the Department of Corrections (Department) as violative of their rights to Due Process and Equal Protection.
On November 15, 1995, this court (Lopez, J.) certified an open class defined as “all prisoners who are now confined or may at some point be confined at/in any housing unit other than the Department Disciplinary Unit.” The representative class is comprised of 536 prisoners.
This matter came before me on cross motions for summary judgment pursuant to Mass.R.Civ.P. 56. For the following reasons, the Defendants’ Motion for Summary Judgment is DENIED, and the Plaintiffs’ Cross Motion for Summary Judgment is ALLOWED in part and DENIED in part.
BACKGROUND
The Complaint was filed on June 30, 1995, during a lock down at MCI-CJ. During this lock down, the Department, through the Defendants, implemented two policies which the Plaintiffs challenge on constitutional grounds.
On April 19, 1995, Defendant Larry Dubois distributed a memorandum to all prisoners outlining the Department’s policy regarding inmate involvement in prison gangs. On January 8, 1996, the Department issued a Security Threat Group Management Procedural Statement which was attached to the Plaintiffs’ Motion as Exhibit C-ll. Outlined in this statement were the guidelines for identifying and classifying inmates involved in gang related activities. The implementation of this policy is the focus of the Plaintiffs’ equal protection claims.
On June 2, 1995, Defendant Duval notified the inmates that the prison would implement a two-phase system of housing where the East Wing units would be more restrictive than the West Wing units. While the phase system terminology has been abandoned, the East Wing is still more restrictive than the West Wing of the prison. It is the conditions of confinement in the East Wing units which give rise to the Plaintiffs’ due process claims.
The undisputed material facts in the summary judgment record are as follows:
The prison at MCI-CJ is divided into two sections, the East and West Wings. The West Wing units provide restrictive confinement and are comprised of three units, each containing 72 one-man cells. The East Wing units are more restrictive and contain eight housing units, each with 45 one-man cells. Four of these units are labeled the Plymouth units[1] which house inmates who have been labeled as members of prison gangs in accordance with the Department’s gang policy.
The material factors necessary for the legal analysis mandated by case law regarding the conditions of confinement are undisputed and are compiled in a chart attached as an Appendix to this decision in order to facilitate factual comparisons.[2]
The unit which was formerly called the Department Segregation Unit (DSU) no longer exists. However, the Supreme Judicial Court refused to allow the repeal of the regulations which governed the DSU unit, and therefore, the regulations remain valid.
*253 Ninety percent of the inmates being housed in the Plymouth units are Hispanics and have been labeled as gang members. Department statistics show that Hispanics comprise approximately 20% of the entire prison population.
DISCUSSION
Summary judgment shall be granted where there are no genuine issues as to any material fact and where the moving party is entitled to judgment as a matter of law. Community Nat’l. Bank v. Dawes, 369 Mass. 550, 553 (1976); Cassesso v. Commissioner of Correction, 390 Mass. 419, 422 (1983); Mass.R.Civ.P. 56(c). The moving party bears the burden of affirmatively demonstrating the absence of a triable issue, and that the summary judgment record entitles the moving party to judgment as a matter of law. Pederson v. Time, Inc., 404 Mass. 14, 16-17 (1989). The moving party may satisfy this burden either by submitting affirmative evidence that negates an essential element of the opposing party’s case or by demonstrating that the opposing party has no reasonable expectation of proving an essential element of his case at trial. Kourouvacilis v. General Motors Corp., 410 Mass. 706, 716 (1991); Flesner v. Technical Communications Corp., 410 Mass. 805, 809 (1991). Once the moving party establishes the absence of a triable issue, the party opposing the motion must respond and allege specific facts establishing the existence of a genuine issue of material fact. Pederson, 404 Mass. at 17.
The Plaintiffs’ Due Process Claim
The lens through which the Plaintiffs’ due process claim must be analyzed was established by the United States Supreme Court in Sandin v. Conner, 515 U.S. 472 (1995). The Sandin case presented the opportunity for the Court to review and revise its jurisprudence with regard to due process claims by prison inmates. Conner was an inmate serving a term of 30 years to life in a Hawaii state prison. Id. at 474-75. Following an incident with a prison guard which resulted in a violation of the disciplinary rules, Conner was sentenced to 30 days in disciplinary segregation. Id. at 475. Conner filed suit claiming that his due process rights were violated. Id. at 476.
The Federal District Court granted summary judgment in favor of the prison officials and Conner appealed. Id. The Ninth Circuit Court of Appeals (the Ninth Circuit) reversed, concluding that Conner had a liberty interest in remaining free from disciplinary segregation based on its interpretation of the applicable prison regulations. Id. The Ninth Circuit found that the regulation limited the discretion of the prison officials. Id. at 477. Based on that regulation, the Ninth Circuit drew a negative inference that prison officials could not subject a prisoner to disciplinary segregation without making a finding of guilt supported by substantial evidence. Id. Based on the Supreme Court’s earlier jurisprudence, the Ninth Circuit found that the regulation created a liberty interest which could not be infringed upon without due process of law. Id.
The Supreme Court reversed the Ninth Circuit on a 5-4 vote, and in the process, radically changed the methodology for analyzing when an inmate has a liberty interest such that he is entitled to the protections of due process. The Court examined its earlier decisions in Wolff v. McDonnell, 418 U.S. 539 (1974), Meachum v. Fano, 427 U.S. 215 (1976), and Hewitt v. Helms, 459 U.S. 460 (1983), and examined the line of cases which followed these decisions. The decisions in Wolf, Meachum, and Hewitt were based on the general proposition that if state statutes or prison regulations contained “language of an unmistakably mandatory character such that the incursion on liberty would not occur absent specified substantive predicates,” a protected liberty interest had been created. Id. at 480. The examination of statutes and regulations for mandatory language in the line of cases following Wolff, Meachum and Hewitt also led courts to look to the negative implications of this mandatory language to find liberty interests, just as the Ninth Circuit did in Sandin. The Supreme Court’s analysis of these cases found four significant negative effects: 1) it encouraged prisoners to comb through statutes and regulations in search of mandatory language upon which to base a due process claim; 2) it led to the involvement of the courts in the day to day management of prisons; 3) it discouraged the promulgation of regulations by prison officials in order to avoid law suits; and 4) it led courts to analyze the liberty interest issue in a very mechanical way instead of looking at the nature of the liberty lost. See Id. at 481-82.
The Sandin Court opined that “the search for a negative implication from mandatory language in prisoner regulations has strayed from the real concerns undergirding the liberty protected by the Due Process Clause. The time has come to return to the due process principles we believe were correctly established and applied in Wolff and Meachum." Id. at 483. Based on this “return” to its holdings of the past, the Court found that states may create a liberty interest protecting prisoners from certain conditions of confinement only if those conditions impose an “atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.” Id. at 484.
The Sandin Court mandated a factual comparison between the conditions of the restrictive confinement in question and the conditions experienced by other prisoners within the prison. Id. at 485-86. Among the factors considered by the Sandin Court were inmate privileges, length of in-cell confinement, and the length of time the inmate would be subject to the more restrictive conditions. Id. at 486. In addition, the Court looked to whether the placement in more restrictive conditions would affect the duration of the prisoner’s sentence. Id. at 487.
*254 In applying this new test to the facts, the Sandin Court found that Conner’s placement in segregation for 30 days, as punishment for a disciplinary offense, did not “work a major disruption in his environment,” and therefore, was not an atypical and significant hardship such that the state could create a liberty interest giving rise to due process protections. Id. at 485. The Court found that the conditions in segregation were not significantly more restrictive than those in general population and was not outside the “range of confinement to be normally expected” for an inmate serving a term such as Conner’s. Id. at 487. In addition, the Court found that while a period of time in segregation may affect a prisoner’s chance for parole, such a possibility for a negative effect was too attenuated to trigger the protections of due process. Id.
Despite the position taken by the Department, the Supreme Court’s ruling in Sandin does not create a per se blanket rule that there can be no liberty interest implicated in conditions of confinement. See DeLong v. Commissioner of Corrections, 46 Mass.App.Ct. 353, 356 (1999). What the Court did was mandate a careful analysis of the facts of each case to determine whether an inmate is subjected to atypical and significant hardship, and if so, whether the state has created a liberty interest in being free from those conditions which triggers the protections of the due process clause. See Sandin, 515 U.S. at 483-84.
As the Massachusetts Appeals Court stated in De-Long, “there will, no doubt, be many instances where the situations of record, including comparative elements, will be clear on their face and summary judgment or a like disposition will be called for and readily justified.” DeLong, 46 Mass.App.Ct. at 357. This is just such a case.
A. Application of the Sandin analysis
1. Factual comparison of conditions of confinement
The two most critical factors in the analysis required by Sandin are the amount of time an inmate is confined to his cell and the length of time the prisoner is to be subjected to these more restrictive conditions. See Sandin, 515 U.S. at 486. This position is implicit in the Sandin case and other federal cases which have applied the Sandin analysis. See e.g. Williams v. Fountain, 77 F.3d 372 (11th Cir. 1996) (court assumed deprivation of liberty for sentence of one year in segregation); Whitford v. Boglino, 63 F.3d 527 (7th Cir. 1995) (six months of segregation for disciplinary offense not enough to meet first prong of Sandin test).
First, in the case before me, an analysis of the amount of time prisoners in the East Wing and West Wing of the prison spend in lock down, demonstrates a very stark difference in the manner prisoners are treated. On the average day, inmates held in the East Wing and Plymouth units of the prison are locked down in their cells for 22½ (East Wing units) to 23 (Plymouth units) hours per day. In contrast, inmates assigned to the West Wing are out of their cells for as long as 15 hours per day, spending over 50% more time out of their cells in one day as those in the East Wing and Plymouth units enjoy in an entire week. See Appendix.
The circumstances of the Plaintiffs’ placement in the East Wing and Plymouth units in this case are entirely different from that of the inmate in Sandin. The Defendants admit that no prisoner is assigned to the East Wing or Plymouth units as punishment for a specific disciplinary offense. The conditions imposed on the Plaintiffs herein are for the purposes of routine housing. However, these conditions are nearly indistinguishable from a disciplinary sanction, and are beyond the “range of confinement to be normally expected” even at a maximum security facility such as Cedar Junction, Sandin, 515 U.S. at 487, where placement in the segregation units occur when an inmate is being investigated for a disciplinary offense, and is intended to be punitive in nature. The result of the Defendants’ classification system is that inmates placed in the East Wing and Plymouth units are subjected to essentially the same conditions as those inmates placed in segregation units for affirmative misconduct. Inmates at MCI-CJ placed in a segregation unit are there pending the outcome of an investigation or disciplinary hearing. In accordance with the Department’s regulations, these endeavors are usually completed within a relatively short time frame.[3] However, as discussed above, inmates in the East Wing and Plymouth units spend an indefinite period of time under essentially the same conditions as those facing disciplinary charges. In addition, inmates in the segregation units receive status review on a bimonthly basis whereas inmates in the East Wing and Plymouth units are only entitled to status review every six months.[4]
The second critical difference between this case and Sandin is the length of time inmates are subjected to locked down conditions. In Sandin, the disciplinary sanction for Conner was segregated confinement for a fixed period of 30 days. The Plaintiffs in this case are assigned to the East Wing and Plymouth units for indefinite periods of time which could conceivably extend through the entire length of their incarceration. The Plaintiffs’ expert determined that the average time spent in these cell blocks for a representative sampling of the entire class was 270 days, nine times the length of time at issue in Sandin.
In addition, other privileges are severely restricted for those in the more restrictive units in the East Wing. East Wing inmates eat every meal in their cell as opposed to West Wing inmates who eat their meals with other inmates in the chow hall. Canteen privileges for those in the East Wing and Plymouth units are 40% less than those in the West Wing. Approximately 93% of the inmates held in the East Wing and Plymouth units are unable to work a prison job[5] which not only *255 limits their ability to get out of their cell, but also limits their opportunities to earn good time credits which would shorten their length of incarceration.[6]
Based on the factual record regarding the conditions of confinement in all the various housing units, and following the methodology set forth in Sandin, I find as a matter of law that the conditions present in the East Wing and Plymouth units of MCI-CJ are so restrictive that they impose an atypical and significant hardship on the inmates assigned to these units.
2. State created liberty interest
The Sandin Court held that states may create liberty interests when prisoners are subject to conditions which are an “atypical and significant” hardship. Having found that the conditions in the East Wing and Plymouth units satisfy the first prong of the Sandin test, the issue of whether the state has created any regulations which would trigger a prisoner’s rights to due process protections remains.
The Department argues that because there are no regulations which govern the conditions in the East Wing and Plymouth units, the state has not created a liberty interest and therefore, the inmates are not entitled to due process.
The second prong of the Sandin test is satisfied if regulations exist which the Department must comply with and the regulations concern the conditions of specific units and the process by which prisoners are assigned to those units, particularly if the conditions are substantially the same as those in the East Wing and Plymouth units. I find that the conditions in the East Wing and Plymouth units are substantially the same as those which existed in the former DSU. Therefore, the regulations which applied to the DSU must be complied with regarding the placement of inmates in the East Wing and Plymouth units at MCI-CJ. See Longval v. Commissioner of Correction, 404 Mass. 325 (1989). “(T]he department and the commissioner may not sidestep statutory and regulatory provisions stating the rights of an inmate as to his placement in a D.S.U. by assigning as a pretext another name to such a unit.” Id. at 328-29.
The Appendix demonstrates that East Wing inmates enjoy 2 hours more out-of-cell time than inmates assigned to the former DSU. However, in light of the unopposed Affidavits of the Plaintiffs, which indicate that visits and other out of cell activities are scheduled during the regular recreation period, I find that East Wing inmates may indeed spend more time in lock down than former DSU residents. The Appendix also shows that inmates in the Plymouth units spend more time in lock down than those in the DSU. The evidence in the record demonstrates that the conditions of confinement in the East Wing and Plymouth units are substantially the same as those found in the former DSU at MCI-CJ.
The Defendants contend that the conditions in the East Wing are less restrictive than those in the former DSU. I am not persuaded by this argument. Indeed, some of the distinctions advanced by the Defendants demonstrate that the actual conditions in the DSU may not have been in compliance with the applicable regulations. For example, the Affidavit of Mark J. Powers states that inmates in the DSU had “no per se out of cell time.” Defendants’ Exhibit 27. This is a violation of the regulations which required that all inmates be afforded one hour of “daily exercise and recreation period of at least one hour per day five days per week, outside if weather permits.” 103 Code Mass. Regs. 421.20(2)(c). The Department cannot argue that because of its failure to comply with the applicable regulations, the actual conditions in the DSU were more severe than those present in the East Wing. That analysis is patently unfair and circumvents courts from accurately comparing conditions of confinement such as the one at bar.
The Department contends that the East Wing is general population. In light of the vast differences between the East Wing and West Wing, the position taken by the Department is not persuasive. The conditions which exist in the East Wing are nearly identical to those which existed in the former DSU. Based on the submissions before me, the Department’s contention that the East Wing is “general population” is the sort of pretextual semantic change aimed at avoiding compliance with regulations which the Supreme Judicial Court criticized in Longval.
Based on the Longval decision, having found that the conditions in the East Wing and Plymouth units are substantially the same as those which were present in the former DSU, I find that the DSU regulations, which have not been repealed, create a liberty interest such that inmates must be afforded the requisite due process in compliance with 103 Code Mass. Regs. 421. Having found no genuine issues of material fact, I rule that the Plaintiffs are entitled to judgment as a matter of law, and therefore, the Plaintiffs’ Motion for Summary Judgment is ALLOWED with respect to the due process claims in the complaint. Cassesso, 390 Mass. at 422. Accordingly, the Defendants’ Motion for Summary Judgment on the due process claim is DENIED.
B. The Equal Protection Claim
The Equal Protection claim brought by the Plaintiffs requires a demonstration that they are: 1) members of a distinct class; and 2) being purposefully discriminated against. See Personnel Administrator of Massachusetts v. Feeny, 442 U.S. 256, 272 (1979). “(E]ven if a neutral law has a disproportionately adverse effect upon a racial minority, it is unconstitutional under the Equal Protection Clause only if that impact can be traced to a discriminatory purpose.” Id. at 272.
The Plaintiffs contend that the Defendants’ gang policy subjects the Plaintiffs to discriminatory treatment resulting in their being assigned to more restrictive confinement than other inmates. The Defendants contend that the policy is neutral with regard to race and *256 ethnicity and is evenly applied. The Defendants also contend that absent proof that the policy was intentionally designed to purposely discriminate against the Plaintiffs, the Plaintiffs’ equal protection claim must fail. The Defendants misconstrue equal protection law. The Plaintiffs need only show a disparate impact which can be traced to a discriminatory purpose, not purposeful discrimination in the design of the policy. See id. at 272.
It is uncontroverted that the Department has a legitimate interest in institutional security, including the control of prison gangs. Actions taken by prison officials to achieve such goals must be given a measure of deference, even if the measures taken are preventative in nature. See Jones v. North Carolina Prisoners’ Labor Union, Inc., 433 U.S. 119, 132-33 (1977) (“Responsible prison officials must be permitted to take reasonable steps to forestall such a threat, and they must be permitted to act before the time when they can compile a dossier on the eve of a riot”).
The policy, as presented in the record, appears to be neutral on its face. The various factors taken into consideration by the Department when labeling inmates as gang members are equally applicable to all inmates with no obvious bias against the Plaintiffs built into the system. The issue is whether the Department’s policy is being implemented in a non-discriminatory manner with regard to the Plaintiff class herein.
There is little question that the Hispanic Plaintiffs are members of a “recognizable, distinct group” for purposes of equal protection analysis. Commonwealth v. Aponte, 397 Mass. 494, 501 (1984); see also United States v. Pion, 25 F.3d 18, 22-23 (CA 1 Mass. 1994) (Court accepted the position of the parties that Hispanics constitute a distinctive ethnic group in Massachusetts for purposes of equal protection injury venire cases). This protected class for equal protection purposes is significantly different, and therefore distinguishable from, the Supreme Judicial Courts holding in Commonwealth v. De la Cruz, 405 Mass. 269 (1989). In De la Cruz, the court found that Hispanics were not a “race” for purposes of G.L.c. 234, §28 which allows for individual voir dire in the trials of inter-racial crimes. The Defendants contend that the Plaintiff class is not suspect in this case. I find that this position lacks merit. The cases cited by the Defendant are easily distinguished.
For example, in Commonwealth v. Olivo, 369 Mass. 62 (1975), the issue was whether the defendant’s equal protection rights were violated by the Springfield Housing Department’s policy to issue all its notices only in English. The Court stated “While we agree that, under certain circumstances, person of Spanish descent may constitute a suspect classification, and that a statute neutral on its face may operate in a discriminatory manner, we do not believe that either principle is controlling here.” Id. at 72. The Court did not foreclose the possibility of a suspect class but determined on the facts of the case that those affected by the policy were people who did not speak English, not those of Spanish descent. Id.
In Pagan v. Commissioner of Correction, 884 F.Supp. 25, 28 (D.Mass. 1995), the Federal District Court refused to certify a class of Latin-American plaintiffs seeking cultural programs in prisons because the term “Latino” was too broad to ensure that no members of the class had interests antagonistic to each other. The Court’s reasoning was based not on a finding that “Latinos” were not a distinct group, but that the remedy being sought would not be the same for all the plaintiffs since the proposed class was comprised of many varying cultural and ethnic backgrounds. Id. In this case, all the Hispanic Plaintiffs seek the same thing, equal application of the Department’s gang policy. Based on the applicable case law, the Hispanic Plaintiffs are part of an identifiable group for the purpose of the equal protection analysis.
When the policy in place is facially neutral, as in this case, the Plaintiffs must show that there is a disproportionate adverse impact which can be traced to a discriminatory purpose. See Feeney, 442 U.S. at 272. While a statistical showing of disparate impact may be a factor which can demonstrate purposeful discrimination, it is insufficient in and of itself. See Washington v. Davis, 426 U.S. 229, 239 (1976). However, “an invidious discriminatory purpose may often be inferred from the totality of the relevant facts, including the fact, if it is true, that the law bears more heavily on one [group] than another.” Id. at 242.
One of the factors which a court may consider in examining a plaintiffs equal protection claim is the discriminatory animus of those implementing the policy. In Santiago v. Miles, 774 F.Supp. 775, 801 (W.D.N.Y. 1991), a Federal District Court found that its conclusion that prisoners’ equal protection rights had been violated was supported by evidence that “a pervasive atmosphere of racism infects decision-making especially at the lower levels of the prison’s administration.” Id. at 242. The Plaintiffs in this case have presented numerous affidavits alleging widespread use of racial and ethnic slurs and epithets by prison guards aimed at Hispanic inmates. Prison guards are involved in the gang classification system since the policy’s formula includes an assignment of points based on routine observations of the inmates for gang related activity.[7]
The Plaintiffs’ Affidavits on this issue lends support to their position that the gang policy is implemented in a discriminatory manner. While the Plaintiffs allege numerous other circumstances which could be factors in determining whether the Department purposely discriminates against Hispanics, it is not necessary to reach these factors at this time. The Plaintiffs’ allegation of racial and ethnic animus, along with the statistical disparity regarding Hispanics labeled as gang members, could be sufficient, if proven, to establish a violation of the Plaintiffs’ equal protection rights.
In response to these allegations, the Defendants merely state that “the policy was not designed to focus *257 on any particular ethnic or racial group of prisoners but was designed to focus on ’’behavior" and “activities” of prisoners and groups of prisoners without regard to race or ethnic background and to manage and, if possible, prevent violent gang incidents. Ethnic, racial and/or national origin play no role in the measure of discipline sought against a prisoner." Maloney Aff., Defendant Exhibit 10. This statement, limited as it is, establishes that there is genuine issue of material fact in dispute regarding the implementation of the Department’s gang policy.
Based on the record in this case, I find that the equal protection issue is not ripe for summary judgment. How the Department’s gang policy is implemented is clearly a material issue. The Defendants claim to administer a purely neutral policy, evenly applied, while the Plaintiffs have brought forth evidence of ethnic and racial animus. I am persuaded that there are genuine issues of material fact which cannot be resolved on these Motions for Summary Judgment. See Cassesso, 390 Mass. at 422. The Motions of both parties, therefore, are DENIED as to the Plaintiffs’ equal protection claim.
C. The Lock Down Conditions and The Use of Force
The Plaintiffs’ Complaint seeks declaratory and injunctive relief regarding the conditions of confinement during the 1995 lock down. In addition, the Plaintiffs seek a declaration which would find the Department’s systematic use of force to be in violation of the Eighth Amendment protections against cruel and unusual punishment. This particular portion of the Complaint is vague with regard to the time frame in which these claims arose — during the lock down or during normal operations of the institution.
The Defendants seek to take advantage of the Plaintiffs’ pleading and have requested that I declare that the Department violated no laws during the lock down and that its operational parameters since the lock down, specifically regarding the use of force, conformed with Eighth Amendment standards.[8] The Plaintiffs contend, on the other hand, that these issues have become moot since the lock down was officially lifted on August 7, 1995. “It is the general rule that courts decide only actual controversies.” Metros v. Secretary of the Commonwealth, 396 Mass. 156, 159 (1985). Following this rule, courts normally do not decide moot questions. Id. While there are exceptions to the mootness doctrine, the exceptions do not apply to this case regarding the conditions of confinement during the lock down.
The Plaintiffs make the same mootness argument with regard to allegations of a pattern and practice of excessive use of force, beatings and gassings. However, because the Complaint is not clear with respect to the time frame involved, the issue is not moot. Furthermore, “many conditions and operational aspects that existed during the lockdown have continued throughout the pendency of this litigation and continue today.” Defendant’s Supplemental Brief on Cross-Motions for Summary Judgment, p. 17. I find that there are genuine issues of material fact regarding these issues which must be resolved by an evidentiary hearing.
The Department correctly states that when a complaint for declaratory judgment is denied on the merits, the rights of the parties must be declared. Attorney General v. Kenco Optics, Inc., 369 Mass. 412, 418 (1976). The critical portion of that decision is that the trial court must decide the merits of the action before a declaration can be made. The issues raised in the Plaintiffs Complaint regarding the use of force are of serious import to both the Plaintiffs and the Department. These claims also raise difficult constitutional issues regarding the Eighth Amendment. The record before me, however, is incomplete on these claims and the matter was not fully argued before me. I therefore decline to reach the merits of the Plaintiffs’ claims regarding the use of force at this time. The Defendants’ Motion for Summary Judgment on this issue is DENIED without prejudice and no declaration shall issue.
ORDER
For the foregoing reasons, the Defendants’ Motion for Summary Judgment is hereby DENIED. The Plaintiffs’ Cross Motion for Summary Judgment is ALLOWED with respect to the due process claim, and DENIED as to all other claims.
I further DECLARE as follows:
1) The conditions of confinement in the East Wing units, including the Plymouth units, at MCI-CJ impose an atypical and significant hardship on the inmates housed in those units;
2) The conditions in the East Wing and Plymouth units are substantially similar to the conditions which existed in the former Departmental Segregation Unit;
3) The regulations controlling the former DSU, 103 Code Mass. Regs. 421, must be fully complied with before inmates may be subjected to the restrictive conditions of the East Wing and Plymouth units.

The Plaintiffs in their Memoranda refer to the Plymouth units as the Plymouth cell blocks and Plymouth Units. I have chosen to use the phrase Plymouth units.

The extensive record in this case revealed occasional discrepancies among various documents and affidavits. Without making any credibility determinations regarding the contradictory affidavits, the facts regarding the conditions compiled in the attached chart were gleaned from documents produced by the Department for dissemination to the inmates for orientation purposes. The conditions outlined in these Department documents and the regulations promulgated to control conditions within particular units were the basis for the comparative analysis.

 103 C.M.R. 430 et. seq. calls for investigation and issuance of a disciplinary report and commencement of any hearing within a “reasonable” time, normally within a two week period of time.

The Plaintiffs' expert states that a review of the Plaintiffs’ files indicates that less than 15% of those in the East Wing *258 and Plymouth units received a review within 12 months of placement.

Only three “runner” jobs are available in each 45-man block.

 I recognize that inmates do not have a right to work in a prison job. However, the fact that all West Wing inmates must work, and therefore, have the opportunity to earn good time credits is a significant factor to be considered regarding the different conditions of confinement.

Such routine observations include "visiting, corresponding, financial transactions with known relatives and close associates of confirmed members” and “routinely walking, eating, recreating, or otherwise directly associating with confirmed members; also, routine communication with confirmed members.” Security Threat Group Management Procedural Statement, Plaintiffs Exhibit C-ll.

The Defendants admit that they seek this declaration with the intent of limiting future pro se litigation regarding these issues.