Tracie HOPE, et al., Respondents,

v.

NISSAN NORTH AMERICA, INC., Appellant.

No. WD 73299.

Missouri Court of Appeals, Western District.

Sept. 20, 2011.

Application for Transfer to Supreme Court Denied Nov. 1, 2011.

Application for Transfer Denied Dec. 20, 2011.

Peter Brennan, John W. Cowden, David M. Eisenberg, and Anne Elizabeth Baggott, Kansas City, MO, for appellant.

Lawrence Benjamin Mook, Excelsior Springs, MO; Michael W. Blanton, Leawood, KS; and Kevin Daniel Stanley, Kansas City, MO, for respondents.

Before Division Two: JAMES M. SMART, JR., P.J., MARK D. PFEIFFER and CYNTHIA L. MARTIN, JJ.

JAMES M. SMART, JR., Judge.

This case involves a putative class action lawsuit filed against Nissan North America, Inc. ("Nissan") on behalf of five named plaintiffs, Tracie Hope, Michael Meyer, Pamala Meyer, Ginger Bridger, and Robert Hurst (collectively, "Plaintiffs") based on allegations of a cosmetic bubbling defect in the dashboard of certain Infiniti FX35 and FX45 vehicles for model years 2003 through 2007 ("FX Vehicles"). The putative class members include all Missouri residents who currently own an FX; class membership under the current class definition is based strictly on ownership rather than on the experience or observation of a defect. The trial court certified the class. Pursuant to Rule 52.08(f), Nissan sought permission to appeal the certification. We granted permission. We now affirm in part and reverse in part.

### Background

The manufacturing of the Infiniti FX35 and FX45 cars began in late 2002. By 2006, Nissan had become aware of instances of bubbling dashboards of FX Vehicles, namely in the "hot and humid" states of Florida, Texas, Georgia, North Carolina, and Alabama. No instance of dashboard bubbling was reported in Missouri until 2007. After conducting an investigation of these instances, Nissan ordered changes to the curing process used on the dashboards to prevent future bubbling instances. However, after the production run for the 2007 Model Year, it became apparent the change in the curing process was not sufficiently addressing all dashboard bubbling problems.

Production of the FX Vehicles ceased in April of 2007. At that time, Nissan launched another inquiry into the dashboards regarding the revised manufacturing process. As a result, in January 2009, Nissan changed dashboard suppliers for replacement dashboards for the FX Vehicles. The new dashboards were manufactured with a new raw material.

In early 2010, Nissan implemented a warranty extension program for the FX Vehicles. Under this program, Nissan extended the warranty for FX Vehicle dashboards to eight years and unlimited mileage. Nissan agreed to replace bubbled dashboards at no cost to the consumer experiencing bubbling. Nissan agreed to provide free loaner vehicles during dashboard replacement. Nissan also agreed to reimburse any customer who might have paid for a dashboard replacement. The warranty went into effect on issuance and was automatically fully transferrable to all future owners of the vehicle.

The Plaintiffs in this action are current owners of FX Vehicles. None of the Plaintiffs have experienced dashboard bubbling. The nature of the theory of monetary damages is less concrete than a theory based on an experience of bubbling, because it is independent of whether the dashboard of each owner has in fact bubbled. At its essence, it is a claim that every FX owner has been damaged economically because each paid for the vehicle as though there were no latent defect to which the vehicle is subject, when in fact there is a taint that applies to the vehicle due to the possibility of dashboard bub-

bling.[1]

The class membership is based on "ownership" of an FX Vehicle on the theory that Nissan breached express warranties, the implied warranty of merchantability, and violated the Missouri Merchandising Practices Act ("MMPA") as a result of the alleged defect. Specifically, Plaintiffs allege that the bubbling defect "diminishes the value of the [FX], regardless of whether the defect has actually manifested in any particular vehicle, because the existence of the defect places a stigma upon the Subject Vehicle that reduces [its] marketability and resale value."

After consideration of arguments, the trial court granted Plaintiffs' motion for certification and certified the class ("putative class"). The trial court certified the following class (excluding the parties and their counsel and similarly conflicted persons), for *each* of the Plaintiffs' causes of action:

> All persons who purchased and currently own an Infiniti FX35 or FX45, model years 2003 through 2007 inclusive, in the State of Missouri, with the dashboard installed as original manufacturer's equipment.

The trial court's order defined the putative class using the Plaintiffs' submitted definition, but the order also recognized the definition "should be further refined." As of this date, the definition has not been further refined.

On December 17, 2010, this court stayed the underlying action until the interlocutory appeal is complete. Nissan seeks a ruling from this court decertifying the class.

### Standard of Review

■ Rule 52.08[2] governs class action proceedings. "Determination of whether an action should proceed as a class action under Rule 52.08 ultimately rests within the sound discretion of the trial court." *State ex rel. Am. Family Mut. Ins. Co. v. Clark,* 106 S.W.3d 483, 486 (Mo. banc 2003) (citing *Ralph v. Am. Family Mut. Ins. Co.,* 835 S.W.2d 522, 523 (Mo.App.1992)). Review of a class certification order is for an abuse of discretion. *See State ex rel. Union Planters Bank, N.A. v. Kendrick,* 142 S.W.3d 729, 735 (Mo. banc 2004). A circuit court "abuses its discretion if 'its order is clearly against the logic of the circumstance, is arbitrary and unreasonable, and indicates a lack of careful consideration.'" *State ex rel. Ford Motor Co. v. Manners,* 239 S.W.3d 583, 586–87 (Mo. banc 2007) (quoting *State ex rel. Ford Motor Co. v. Messina,* 71 S.W.3d 602, 607 (Mo. banc 2002)).

■ "A class action is designed to promote judicial economy by permitting the litigation of the common questions of law and fact of numerous individuals in a single proceeding." *Craft v. Philip Morris Cos., Inc.,* 190 S.W.3d 368, 378 (Mo.App. 2005). The determination of certification is a matter for the trial court's discretion. *Plubell v. Merck & Co., Inc.,* 289 S.W.3d 707, 711 (Mo.App.2009). Rule 52.08 provides that "[a]s soon as practicable after

---

1. Although the Plaintiffs have not experienced the bubbling, Plaintiff Hope nevertheless has received a newly designed dashboard through the warranty extension program, and Plaintiffs Michael and Pamala Meyer and Bridger have contacted their respective dealers to arrange replacement of their dashboards. Plaintiff Hurst had not decided whether to replace his dashboard.

2. All rule citations are to the Missouri Supreme Court Rules (2011), unless otherwise indicated. In addition to Rule 52.08, section 407.025 RSMo 2000, which overlaps Rule 52.08, governs class actions.

the commencement of an action brought as a class action, the court shall determine by order whether it is to be so maintained." Rule 52.08(c)(1). This means the trial court is normally required to make its determination regarding certification "before the benefit of full discovery or the actual presentation of evidence." *Smith v. Am. Family Mut. Ins. Co.*, 289 S.W.3d 675, 688 (Mo.App.2009).

"[T]he party seeking class certification has the burden of proof." *Dale v. DaimlerChrysler Corp.*, 204 S.W.3d 151, 164 (Mo.App.2006). "This burden is satisfied if there is evidence in the record, which if taken as true, would satisfy each and every requirement of the rule." *Id.* at 164–65. "In class certification determination, the named plaintiffs' allegations are accepted as true." *Hale v. Wal–Mart Stores, Inc.*, 231 S.W.3d 215, 227 (Mo.App. 2007) (noting that arguments which tend to negate allegations from the petition should be ignored because such allegations are taken as true for purposes of a class certification motion). Therefore, the determination of class certification is based primarily upon the allegations in the petition.

The court's principal concern in addressing the propriety of class certification is whether the plaintiff has established the requirements for certification. *Plubell*, 289 S.W.3d at 712; *see* Rule 52.08. "The issue is not whether the plaintiff has stated a cause of action or will prevail on the merits, but rather whether plaintiff met the requirements for a class action." *Dale*, 204 S.W.3d at 178. However, the court's analysis of the evidence and record submitted to determine class certification *may overlap somewhat with the merits* of the plaintiffs' alleged causes of action. *Craft*, 190 S.W.3d at 377. "Although the class certification decision is independent of the ultimate merits of the lawsuit, the applicable substantive law is relevant to a meaningful determination of the certification issues." *Green v. Fred Weber, Inc.*, 254 S.W.3d 874, 880 (Mo. banc 2008). "[C]ourts must not forget that the underlying question in any class action certification is whether the class action device provides the most efficient and just method to resolve the controversy at hand, all things considered." *State ex rel. Coca–Cola Co. v. Nixon*, 249 S.W.3d 855, 860–61 (Mo. banc 2008).

In order to establish a basis for certification, the plaintiff must establish the four prerequisites set forth in Rule 52.08(a):

One or more members of a class may sue or be sued as representative parties on behalf of all *only* if (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

(Emphasis added.) These requirements are commonly referred to as numerosity, commonality, typicality, and adequacy. *Wright v. Country Club of St. Albans*, 269 S.W.3d 461, 466 (Mo.App.2008). In addition, to be certified, the plaintiff must establish that the proposed class fits within the terms of Rule 52.08(b)(1), (b)(2), or (b)(3):

(b) Class Actions Maintainable. An action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition:

(1) the prosecution of separate actions by or against individual members of the class would create a risk of

(A) inconsistent or varying adjudications with respect to individual members of the class which would establish incompatible standards of con-

duct for the party opposing the class, or

(B) adjudications with respect to individual members of the class which would as a practical matter be dispositive of the interests of the other members not parties to the adjudications or substantially impair or impede their ability to protect their interests; or

(2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or

(3) the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy. The matters pertinent to the findings include:

(A) the interest of members of the class in individually controlling the prosecution or defense of separate actions;

(B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class;

(C) the desirability or undesirability of concentrating the litigation of the claims in the particular forum;

(D) the difficulties likely to be encountered in the management of a class action.

See *Plubell*, 289 S.W.3d at 712. Here, the circuit court found that the Plaintiffs met the certification requirements of Rule 52.08(b)(3)—predominance.

Missouri Rule 52.08 and Rule 23 of the Federal Rules of Civil Procedure, both governing class action lawsuits, are essentially identical. *Dale*, 204 S.W.3d at 161. It is well established in Missouri that "federal interpretations of [Federal] Rule 23 are relevant in interpreting Rule 52.08." *Id.*; *see also Craft*, 190 S.W.3d at 376; *Ralph v. Am. Family Mut. Ins. Co.*, 809 S.W.2d 173, 174 (Mo.App.1991). For this reason, we rely on federal cases where Missouri law has not definitively addressed an issue.

## I. Points I & II

At each stage of our analysis, we must pause to remind ourselves that the issue concerning Plaintiffs' claims is not the likelihood that they will ultimately prevail on the merits. We also do not concern ourselves with the substantive law as to each cause of action except when aspects of substantive law relate to the manageability and appropriateness of class action treatment. In other words, we do so only when logically necessary to avoid artificially truncating our analysis of the propriety of class treatment. We must determine whether, if Plaintiffs' claims are taken at face value, they are of such a nature that class treatment is appropriate and is a superior method of adjudicating such claims. With that in mind, we begin our review.

### Class Certification

Nissan's first Point Relied On appears to assert two separate allegations of error. Nissan first contends the trial court erred in its certification of the putative class because the court did not first determine whether a class capable of legal definition even existed before considering the criteria for certification by finding the class definition needed to be "further refined." Second, Nissan argues the trial court erred in directing Nissan, the party opposing the class certification, to submit a pro-

posed class definition, as this burden falls exclusively on the Plaintiffs seeking class certification. Nissan's second Point Relied On reiterates the same concerns as the first half of point one, but breaks down these concerns into four precise areas of concern: the putative class definition 1) is imprecise, indefinite, and overly broad, 2) does not include a discernible number of class members because "current owners" change with each sale of an FX Vehicle, 3) encompasses a substantial number of uninjured class members because the definition includes members whose FX Vehicles have not experienced dashboard bubbling and because Plaintiffs' theory of diminished value due to a stigma is not legally cognizable and not calculable on a class-wide basis, and 4) includes class members whose only possible injury constitutes subjective speculation of dashboard replacement in the future or that the value of the vehicle may hypothetically be diminished.

We will address points one and two together. First, for convenience sake, we will deal with the less complicated issue raised in the second part of Nissan's initial Point Relied On. That issue is whether the trial court properly ordered Nissan to propose *its own version* of a revised class definition.

 "[T]he general practice in both state and federal courts [is that] the party seeking class certification proposes a class definition which is then subject to challenge by the opposing party." *H.L. v. Matheson*, 450 U.S. 398, 432 n. 11, 101 S.Ct. 1164, 67 L.Ed.2d 388 (1981) (Marshall, J., dissenting). The plaintiff has the burden of proof in seeking class certification and the same applies to the class definition. *Dale*, 204 S.W.3d at 164; *see also Coleman v. Watt*, 40 F.3d 255, 258 (8th Cir.1994) ("In order to obtain class certification, a plaintiff has the burden of showing that the class should be certified

and that the requirements of Rule 23 are met."). In *Elsea v. Jackson County, Missouri*, the court pointed out that the proposed class definition could have multiple constructions and was therefore insufficient to accomplish a class definition's purposes. No. 10–0620–CV–W–ODS, 2010 WL 4386538, at *2 (W.D.Mo. Oct. 28, 2010). Discussing amendment of the definition, the court went on to state, "amendment (or at least, an amended understanding) is necessary [and] it is clear that the source of that understanding *must come from Plaintiff.* Plaintiff is the master of his complaint, and he has the burden and responsibility of proposing a legally acceptable definition." *Id.* (emphasis added). Thus, it is the plaintiff who has the burden of submitting a proper class definition or amendment. The defendant cannot be coerced into assisting the success of the plaintiffs' attempt to obtain class certification. Nissan has no duty to provide such assistance.

We therefore agree that the trial court was without authority to direct Nissan to provide assistance regarding the class definition following certification. Nevertheless, it does not follow that the trial court's certification must be reversed for this reason. The trial court will be instructed to strike that portion of the Certification Order.

### The Class Definition

Next, we turn to Plaintiffs' contentions concerning the trial court's approach to the class definition. The trial court concluded that the Plaintiffs' original proposed class definition, which included all Missouri owners of FX Vehicles, was sufficient for purposes of class certification. The court indicated, though, that the definition could be improved. The court provided the parties with an opportunity to

provide input regarding modification of the definition. The trial court stated:

This Court finds that certification of this action is appropriate, and that the class definition proposed by Plaintiffs is sufficient for the purposes of this order granting class certification. However, this Court also finds the class definition should be further refined, and directs the parties to jointly present a modified class definition to this Court [ ]. In the event that the parties are unable to jointly present a modified class definition to this Court [ ], the parties are directed to present their proposed alternatives for a modified class definition and this Court will then select the most appropriate modified class definition from among those alternatives.

The trial court then suggested to the parties some ways of improving upon the class definition, including suggesting a fixed date of vehicle ownership.

▆▆▆▆ Neither section 407.025 [3] nor Rule 52.08 explicitly demands a proper class definition; however, "such a requirement clearly underlies each of the mandatory elements for certification." *Coca–Cola,* 249 S.W.3d at 861. A proper definition is "necessary to realize both the protections and benefits for which the class action device was created." *Id.* (citing *Dale,* 204 S.W.3d at 177–78). "A precise class definition is necessary to identify properly those entitled to relief, those bound by the judgment, and those entitled to notice." *In re Monumental Life Ins. Co.,* 365 F.3d 408, 413 (5th Cir.2004) (internal citations omitted); *see also In re Constar Int'l Inc. Sec. Litig.,* 585 F.3d 774, 782 (3d Cir.2009); *Glen v. Fairway Indep. Mortg. Corp.,* 265 F.R.D. 474, 477 (E.D.Mo.2010) ("The class definition must

enable the Court to determine objectively who is in the class, and thus, who is bound by the ruling.") (internal citations omitted). While the class definition must be sufficiently definite so that it is "administratively feasible" to identify members of the class, this does not mean the class needs to "be so ascertainable from the definition that every potential member can be identified at the commencement of the action." *Craft,* 190 S.W.3d at 387–88; *see also Dale,* 204 S.W.3d at 178. Thus, " '[b]efore considering the criteria established by [section 407.025.3 and Rule 52.08, therefore,] it is first necessary to determine whether the class exists and is capable of legal definition.' " *Coca–Cola,* 249 S.W.3d at 861 (quoting *Vietnam Veterans Against the War v. Benecke,* 63 F.R.D. 675, 679 (W.D.Mo.1974)). The court must deny certification if a class is not properly defined. *Id.*

▆▆▆▆ A class definition may be improper for various reasons. Here, the contention is that it is 1) overly broad and 2) indefinite. *See id.* at 861–62. "A class definition that encompasses more than a relatively small number of uninjured putative members is overly broad and improper." *Id.* at 861 (citing *Oshana v. Coca–Cola Co.,* 472 F.3d 506, 514 (7th Cir.2006); *DeBremaecker v. Short,* 433 F.2d 733, 734 (5th Cir.1970); *Pagan v. Dubois,* 884 F.Supp. 25, 28 (D.Mass.1995); *Vietnam Veterans,* 63 F.R.D. at 681). Overbreadth may refer to the inclusion of a significant number of uninjured persons. An "uninjured person," especially when the injury is not specific and concrete, may be a person who simply does not feel cheated or injured. *See id.* at 862 (consumers did not care whether the sweetener was aspar-

---

**3.** All statutory citations are to the Revised Statutes of Missouri (RSMo) 2000 as updated, unless otherwise indicated.

tame or saccharin). If, after any necessary modifications to the class definition, only a relatively small number of uninjured putative members remain, "the circuit court can easily resolve individual questions after the common questions." *Id.* at 861. However, if a large number of uninjured putative members remain, the putative class is impermissibly overbroad. *Id.*

Also, if the putative class definition is indefinite, it ordinarily will be considered improper. *Id.* " 'The primary concern underlying the requirement of a class capable of definition is that the proposed class not be amorphous, vague, or indeterminate.' " *Craft*, 190 S.W.3d at 387 (quoting *In re Tetracycline Cases*, 107 F.R.D. 719, 728 (W.D.Mo.1985)); *see also Vandyne v. Allied Mortg. Capital Corp.*, 242 S.W.3d 695, 697 (Mo. banc 2008).

Those concepts are well illustrated in the *Coca–Cola* case. The contention in that case was that the class definition was too broad and too indefinite to be properly manageable. 249 S.W.3d at 860–62. The claim was a merchandising practices claim asserting damage to individuals who drank fountain Diet Coke (containing aspartame and saccharin) without being informed that it contained saccharin, and who otherwise assumed it contained only aspartame, like the *bottled* Diet Coke.

The proposed class definition approved by the trial court stated as follows:

All individuals who purchased for consumption and not resale fountain Diet Coke in the State of Missouri after March 24, 1999, through the date of this order. Excluded from this Class are

employees, officers and directors of Defendant.

*Id.* at 859.

Because the proposed class included an "extremely large number" and a high percentage of uninjured class members (those who did not care if the Diet Coke they purchased contained saccharin), the definition was faulty. *Id.* at 862. The Court noted that any effort to modify the class definition (by asking consumers if they dislike saccharin) would result in making the putative class indefinite. *Id.* at 863. For instance, the class definition cannot be modified to take into account the distinction between those who dislike saccharin and those who like saccharin as a sweetener. "Membership may not depend on an individual's subjective preference." *Id.*

The Court in *Coca–Cola* issued its writ of prohibition on the basis that the circuit court abused its discretion in certifying the underlying class. The Court in *Coca–Cola*, in its discussion of indefiniteness, also noted that class membership cannot depend on individual merit determinations.[4] The Court said that such determinations could not be made until the case is concluded. *Id.* at 862.

### Alleged Reduction in Resale Marketability and Value

The Plaintiffs here contend that the mere presence of the possible defect in the dashboard of the FX Vehicles diminishes the vehicle's value, regardless of whether the defect has actually manifested, because the defect places a stigma upon *all* FX Vehicles, reducing marketability and resale value of each particular car. Plaintiffs seek to liken this case to *Craft v. Philip Morris Cos., Inc.*, in which the court al-

4. Although the Court in *Coca–Cola* did not indicate what it had in mind by the reference to "individual merit determinations," the court presumably meant such things as whether the claimant actually practiced avoiding saccharin.

lowed a class certification to proceed as to Missouri consumers of Marlboro Lights cigarettes where the consumers purchased cigarettes wrongfully advertised as "light" cigarettes where the characteristics of the cigarettes were the same as regular cigarettes. 190 S.W.3d at 374. There, the court reasoned that all consumers suffered an economic injury in that they chose to buy Marlboro "lights" for a reason (that they wanted a "light" cigarette), but did not receive the product that was represented to them. *Id.* at 375. Thus, the court believed that it made sense to define the class as all Missourians who purchased Marlboro Lights during the time period in question (but did not have a personal injury claim arising out of the cigarette consumption). *Id.*

Taking Plaintiffs' allegations in their complaint as true, the original putative class is ascertainable as including owners of the FX Vehicles on the theory that each owner would have been or would be damaged by the "stigma" and "diminished resale value" as the Plaintiffs contend, regardless of the manifestation of the defect. While Nissan contends the list of "current owners" of FX Vehicles changes constantly, making the class members indiscernible, we assume that, by the use of time limitations, ultimately a method of determining class membership can be determined, making the class ascertainable. While it is possible that a significant number of FX owners may not feel cheated or injured in any way, at this stage we do not have that information. Moreover, the parties can identify the owners of the FX vehicles. Thus, the putative class is not so overbroad or indefinite within the parameters of an *initial test* of the *class definition* by the trial court, at least for present purposes, that we discern an abuse of discretion in the initial definition.

The court may end up altering or revoking either the class definition or the certification. That fact does not in itself mean that the decision to certify was an abuse of discretion. According to Rule 52.08(c)(1), the trial court is to make a decision on class certification as soon as practicable. The court believed the putative class definition was adequate for certification, and we must assume the court would have certified the class even if a modified definition had been supplied first. While we agree with Nissan that the definition is subject to difficulties, we do not believe we can say at this point that the class definition was *clearly* overbroad or too indefinite.

▆ Nissan contends that Missouri law requires the trial court to have a "final, precise, and definite class definition" prior to initial certification. This limitation has not been imposed upon Missouri courts. Requiring the trial court to rely solely on the original certification definition would defeat all aspects of judicial economy, the underlying purpose of class actions, as the case develops. *See Craft*, 190 S.W.3d at 377–78. Missouri courts consistently recognize a certified class may subsequently be modified or decertified later before a decision on the merits. *See, e.g., Meyer v. Fluor Corp.*, 220 S.W.3d 712, 715 (Mo. banc 2007) ("Although the class certification decision lies in the circuit court's discretion, the courts should err in close cases in favor of certification because the class can be modified as the case progresses."); *Plubell*, 289 S.W.3d at 712; *see also Coca-Cola*, 249 S.W.3d at 861 (noting a class definition may be modified when, in its original form, it includes an overly large number of uninjured class members). Therefore, it would make no sense to require that the initial definition be the final definition.

In a subpart of Point II, Nissan argues that the class definition encompasses many owners who have not experienced dashboard bubbling. While that is true, it does not matter for definition purposes in view of Plaintiffs' asserted theory of economic injury. Nissan argues that Plaintiffs' theory of "diminished value as an injury" is not valid. Nissan says the purported injury is based on subjective speculation as to the possible need to replace a dashboard in the future. Nissan forgets that the merits of this theory are not properly our concern at this stage of our review of the sufficiency of the class definition. We cannot say as a matter of law that this case is like *Coca-Cola*, where the basis of the injury was a subjective consumer *preference*, because the Plaintiffs' theory is that every FX owner has actually been the victim of some economic damage by the stigma associated with the car, regardless of whether the owner even realizes there is a stigma.

Nissan's assertions in the subparts of Point II relate to the issue of whether the class could be certified if the great majority of the members of the class have an injury that is not cognizable in law. Because the record is not developed at this point as to how the Plaintiffs will seek to objectively prove the existence of the legal damage they assert, we cannot speculate on whether Plaintiffs can establish the economic injury they claim. As a result, we cannot say categorically that the trial court abused its discretion in certifying the class.

### Predominance

Next, Nissan contends that the trial court erred in certifying the putative class pursuant to Rule 52.08(b)(3)—predominance—because common questions of law or fact do not predominate over any questions affecting only individual members. The trial court found four core matters "can be established by the same evidence for all members of the class": 1) Nissan's sale of the subject vehicle, 2) the defect in the FX Vehicles, 3) the damages sustained as a result of the defect in the FX Vehicles, and 4) a causal link between the defect and the damages sustained. Nissan, however, contends generally that the evidence necessary to satisfy 52.08(b)(3), does not exist for the key elements of Plaintiffs' three causes of action—Breach of Express Warranty, Breach of Implied Warranty of Merchantability, and violation of the MMPA, section 407.025.3.

Nissan argues the court abused its discretion by not considering the fact that the evidence required to establish liability varies significantly among class members according to such matters as: 1) whether the owner bought the car new from Nissan or bought it as a secondary owner, 2) whether an owner's dashboard bubbled, 3) whether the bubbling occurred during the initial warranty, the extended warranty, or outside of the warranty period, 4) whether the dashboard was replaced, 5) whether the value of a vehicle has actually diminished (according to objective criteria), and 6) whether Nissan was notified by the class member of the problem. Nissan requests that this court reverse the Certification Order because the main common damage issue in this case—the purported stigma arising from the fact that some FX cars have sustained a "bubbling" defect—does not predominate over individual issues.

Certification under Rule 52.08(b)(3) is "proper only where common issues predominate for the class *as defined.*" *Green*, 254 S.W.3d at 877 (emphasis added). Rule 52.08(b)(3) provides that an action may be maintained as a class action if, "the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual mem-

bers, and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy." "Predominance" does not require that all issues be common to the class members. *Dale*, 204 S.W.3d at 175; *see also Green*, 254 S.W.3d at 877. Rather, it requires that *common issues substantially predominate over individual ones. Craft*, 190 S.W.3d at 381. To classify an issue as common or individual, a court looks to the nature of the evidence required to show the allegations of the petition. *Id.* at 382. If the same evidence on a given question will suffice for each class member, then it is common; if the evidence on the question varies from member to member, then it is an individual issue. *Id.* Thus, to the extent that the same evidence will suffice for each member to make a prima facie showing as to a particular cause of action, the commonness makes class treatment appropriate. *See id.*

Our analysis may require consideration of the legal aspects of the merits of the Plaintiffs' causes of action because substantive law is relevant here as to class certification. *See Green*, 254 S.W.3d at 880 ("Although the class certification decision is independent of the ultimate merits of the lawsuit, the applicable substantive law is relevant to a meaningful determination of the certification issues."); *see also Craft*, 190 S.W.3d at 377. The Plaintiffs have alleged three causes of action— Breach of Express Warranty, Breach of Implied Warranty of Merchantability, and violation of the MMPA. For 52.08(b)(3) to be satisfied under each cause of action with the putative class definition, common issues must *substantially* predominate over individual ones as to each cause of action. Under the putative class, the Plaintiffs contend that each member of the class sustained damages (economic loss by virtue of stigma reduction) as a result of the allegedly defective dashboards—

whether such a defect manifested or not. Thus, the Plaintiffs rely on the alleged stigma factor arising from the defect and the damages resulting as the basis of certification. We must examine the issues in light of the asserted theories of liability.

### The Missouri Merchandising Practices Act ("MMPA") Claims

 First, we turn to Plaintiffs' allegations that Nissan violated the Missouri Merchandising Practices Act ("MMPA"), section 407.010 RSMo, *et seq.* "The purpose of [the MMPA] is to preserve fundamental honesty, fair play and right dealings in public transactions." *Plubell*, 289 S.W.3d at 711 (quoting *Schuchmann v. Air Servs. Heating & Air Conditioning, Inc.*, 199 S.W.3d 228, 233 (Mo.App.2006)). The MMPA prohibits "deception, fraud, false pretense, false promise, misrepresentation, unfair practice or the concealment, suppression, or omission of any material fact in connection with the sale or advertisement of any merchandise in trade or commerce" by defining such activity as an unlawful practice. § 407.020.1. Actual damages may be recovered by "[a]ny person who purchases ... merchandise primarily for personal, family or household purposes and thereby suffers an ascertainable loss of money or property, real or personal, as a result of [an unlawful practice]." § 407.025.1. "The MMPA also specifically authorizes class actions where an unlawful practice 'has caused similar injury to numerous other persons.'" *Plubell*, 289 S.W.3d at 712 (quoting § 407.025.2). The requirements for an MMPA class action are prescribed in section 407.025 and are essentially identical to the requirements under Rule 52.08 and Federal Rule 23, with the statute expressing a preference for Rule 23 over Rule 52.08 if a conflict occurs. *Id.*; *see* § 407.025.3; *Dale*, 204 S.W.3d at 161. The fact that class actions

are specifically provided for by statute does not necessarily mean all MMPA class actions should be certified; nor does public policy suggest otherwise. *See Cicle v. Chase Bank USA,* 583 F.3d 549, 556 (8th Cir.2009). However, the fact that the MMPA specifically authorizes class actions is pertinent to consideration of class certification motions.

The Plaintiffs claim in their petition that "[Nissan] violated the [MMPA] by falsely representing to Named Plaintiffs and members of the class that the Subject Vehicle was a high quality luxury vehicle that was constructed with high quality materials and workmanship, and by omitting material information from the materials that were provided to purchasers of the vehicle." Specifically, the Plaintiffs allege twelve separate MMPA claims based upon allegations that Nissan "engaged in deception," "engaged in fraud," "made false promises," "engaged in misrepresentation,"[5] "made untrue statements," "engaged in unfair practices,"[6] "engaged in unconscionable practices," and "[omitted] material facts."[7] To prevail on their MMPA claims, the Plaintiffs must establish that they: (1) purchased an FX Vehicle; (2) for personal, family, or household purposes; and (3) suffered an ascertainable loss of money or property; (4) as a result of an act declared unlawful by section 407.020. *See Hess v. Chase Manhattan Bank, USA, N.A.,* 220 S.W.3d 758, 773 (Mo. banc 2007).

Nissan moved in the trial court for dismissal of the MMPA claims for failure to state a claim upon which relief may be granted. The trial court denied the motion. Nissan does not argue on appeal of the class action certification that we can and should decertify the class on the ground that the Plaintiffs simply do not state a cause of action because they cannot show that Nissan ever materially misrepresented the quality of the vehicle, or led purchasers to believe that it was selling a vehicle absolutely free of blemish and defect (and that describing a vehicle as a "luxury" vehicle does not imply such things to a reasonable person). That issue is not squarely before us for our adjudication here, but remains an issue for the trial court. We proceed as though Plaintiffs have pleaded a cause of action.

Nissan argues that common issues do not predominate in the class because Plaintiffs must show deception, ascertainable loss, and causation, and the individual issues on these elements overwhelm common ones. In addition, for the omission claims, which require scienter, Nissan claims the Plaintiffs are required to show at a minimum that it had knowledge or reason to know of the defect at the time of the sale to each class member, thus individual issues exist regarding Nissan's knowledge at each stage of the class for each individual plaintiff. *See Plubell,* 289 S.W.3d at 713 n. 4.

*Plubell v. Merck & Co.* addressed a similar MMPA claim regarding Merck's sale of the drug Vioxx. 289 S.W.3d at 710. Merck argued the putative class, "Missouri residents who had purchased Vioxx for personal or family use," who were seeking to recover economic damages under the MMPA, did not meet the class action requirement that common issues predominate over individual ones. *Id.* at 710, 711. In particular, Merck claimed that the

---

**5.** Plaintiffs make three separate allegations of misrepresentation.

**6.** Plaintiffs make two separate allegations of unfair practices.

**7.** Plaintiffs make two separate allegations of omission of material fact.

"[p]laintiffs must show deception, ascertainable loss, and causation, and that individual issues on these elements overwhelm common ones." *Id.* at 713. In addition, Merck argued its "knowledge of Vioxx's risks and its representations about Vioxx at the time of each class member's purchase, each prescribing physician's knowledge of the risks, whether a different representation would have affected the class member's taking of Vioxx, and the cost of a substitute for Vioxx" are all individual issues that would have to be proven by the plaintiffs. *Id.*

The court disagreed with Merck. The court found that the central issue in the suit was whether Merck had violated the MMPA by failing to disclose, and concealing, Vioxx's safety risks. *Id.* Because the court found this issue—the legality of Merck's conduct—was "common to all the Missouri class members, and because that issue is at the core of the case," it concluded that the trial court had not abused its discretion in finding the predominance requirement satisfied. *Id.*

The court in *Plubell* found the plaintiffs' MMPA claim did not require proof of Merck's knowledge, because "'[i]t is the defendant's conduct, not his intent, which determines whether a violation has occurred,'" and thus Merck's knowledge of Vioxx's risks at the time of each member's purchase was not something that required the plaintiffs to present individualized proof. *Id.* at 713–14 (citing *State ex rel. Webster v. Areaco Inv. Co.,* 756 S.W.2d 633, 635 (Mo.App.1988)).[8] Second, the court found that because the plaintiffs alleged Merck misrepresented Vioxx throughout the entire class period, individ-

ualized inquiries into Merck's representations as to when each class member purchased Vioxx would be unnecessary. *Id.* at 714. Third, evidence of each physician's or consumer's reliance on Merck's misrepresentation was not required as "reliance is not an element of deception or misrepresentation" under the MMPA's regulations and Missouri's case law. *Id.* (collecting applicable Missouri cases).

Finally, the court concluded the MMPA does not require plaintiffs to demonstrate an "ascertainable loss" by individually showing the cost of alternative therapy or that the unlawful practice caused the class member to make the "purchase" in question. *Id.* at 714–15. Instead, the court found that the "benefit-of-the-bargain" rule alleged by the plaintiffs was "applicable in MMPA cases to meet the element of ascertainable loss." *Id.* at 715. Accordingly, "because [the plaintiffs] alleged Vioxx was worth less than the product as represented, they stated an objectively ascertainable loss under the MMPA using the benefit-of-the-bargain rule." *Id.* (citing *Schoenlein v. Routt Homes, Inc.,* 260 S.W.3d 852, 854 (Mo.App.2008)). Consequently, the court concluded Merck failed to show individual issues predominated over common ones. *Id.*

Nissan seeks to distinguish *Plubell* from the case at hand. Nissan claims *Plubell* is not instructive on the Plaintiffs' diminished value MMPA claims because prescription drugs are fundamentally different from vehicles in that prescription drugs are one-time-use items and cannot be sold after being used. It is true that, as Nissan points out, defective drugs, which cannot

---

**8.** It should be noted that the plaintiffs' claims against Merck did not include claims for "omission of a material fact," which has a scienter or knowledge requirement under the MMPA. *Plubell,* 289 S.W.3d at 713 n. 4 ("By comparison, omission of a material fact under

the MMPA does have a scienter requirement: it is a failure to disclose material facts that are 'known to him/her,* or upon reasonable inquiry *would be known to him/her.'*" (citing 15 C.S.R. § 60-9.110)).

be fixed or repaired, have no value. Nissan argues that this may not be true in a case in which a defendant, at its own expense, corrects a cosmetic flaw in a vehicle under warranty. We must remind Nissan that we do not know how Plaintiffs will go about attempting to show by *objective* means that there is an "ascertainable loss" in this case. Nevertheless, we must proceed on the assumption (yet to be determined in the trial court) that Plaintiffs can show that there is an ascertainable loss, an economic injury, from the alleged stigma.

The claims in *Plubell* did not require scienter, which is pertinent to the fact here that some MMPA claims do not require scienter while others do.[9] The central allegation of the non-scienter claims is whether Nissan "falsely represented" to the Plaintiffs that the FX Vehicles were "luxury vehicles" and whether such alleged false representation resulted in a violation of the benefit-of-the-bargain rule because each FX Vehicle was worth less than the product as represented. As alleged, the claim here, like the one in *Plubell*, does not rely on individualized determinations, as only Nissan's conduct, not its knowledge, matters to determine violation of these provisions of the MMPA. *See id.* at 713–14 (citing *Webster*, 756 S.W.2d at 635). While it complicates matters somewhat that some of the claims do require scienter, as to the non-scienter claims, the Plaintiffs' conduct does not introduce substantial variables here. All of the MMPA claims rely only on evidence regarding Nissan's conduct, which is common to the class as a whole, to the extent we include only original purchasers. The Plaintiffs have alleged that Nissan misrepresented its FX Vehicles throughout the entire class period, rendering unnecessary individualized inquiries into Nissan's representations to the original purchasers. In addition, because the

Plaintiffs have alleged their FX Vehicles are worth less than they were as represented, they argue that they have stated an objectively ascertainable loss under MMPA criteria using the benefit-of-the-bargain rule. Because some owners presumably are secondary owners who did not purchase their vehicles through Nissan's distribution system, the class definition would require adjustment so as not to include such owners. However, that fact does not necessarily preclude a determination individualized issues predominate over common ones for purposes of class certification under the MMPA with a properly adjusted defined class.

For the Plaintiffs' claims for "omission of a material fact" under the MMPA, a greater showing of bad faith or recklessness is required than for the claims based on alleged affirmative representations. "[O]mission of a material fact under the MMPA does have a scienter requirement: it is a failure to disclose material facts that are *'known to him/her*, or upon reasonable inquiry *would be known to him/her.'*" *Id.* at 713 n. 4 (citing 15 C.S.R. § 60–9.110). This means the Plaintiffs must be able to show: 1) Nissan was aware of the alleged defect in the dashboard, 2) when Nissan became aware, and 3) that Nissan purposefully omitted this fact in representations to each individual class member. Again, this requires evaluation of Nissan's conduct, but also, after determining when Nissan became aware of the defect, an individual determination must be made as to when each putative class member purchased their FX Vehicle and if it was at a time when Nissan had knowledge of the defect.

Nissan contends that because it has been determined that Nissan had different levels of knowledge regarding the bubbling

9. This excludes the "omission of a material fact" claims.

issue over the class period as defined,[10] no class-wide proof exists over the entire class for all class members. This is a pertinent observation. Nevertheless, the trial court could decide that the class definition may be modified, or divided into discrete sub-classes (with, perhaps, a very limited number of sub-classes) to accommodate differences in the level of scienter at different times.[11] The trial court may also determine that, for purposes of the claims requiring scienter, a very substantial part, or even a majority, of the original purchasers must be excluded from the class because they purchased their vehicles from Nissan before Nissan had knowledge of the bubbling defect.

Because the facts are not fully developed, we cannot at this point say that it was an abuse of discretion for the trial court to certify the class in view of the significant number of common issues that exist and could have been perceived to predominate over individual ones. Again, we are reminded that the trial court has authority to alter the class definition, and even to revoke certifications as the matter proceeds, if the trial court determines that the commonalities do not predominate, meaning class treatment is a superior means of adjudication. Although *Plubell* is not directly on point because *Plubell* did not involve scienter claims, we believe *Plubell* is sufficiently pertinent to be instructive here. Also, in view of that ability by the trial court to adjust as it determines to be necessary, and in view of our standard of review, we hold that the individual issues are not so numerous for purposes of the MMPA claims that we must reverse the class certification for these claims.

## The Express Warranty Violation Claims

■■■ We next turn to Plaintiffs' claims of breach of express warranty against Nissan. Such claims are, of course, contract claims (codified in the Uniform Commercial Code) rather than statutory tort claims. The Plaintiffs claim that Nissan made statements in marketing materials, brochures, catalogs, and advertisements regarding the quality and future performance of the FX Vehicles, indicating the FX Vehicles were luxury vehicles constructed with high quality materials and workmanship, and that these statements were a material factor in inducing the Named Plaintiffs and Class Plaintiffs to purchase the FX Vehicles. To prove a claim for breach of express warranty in Missouri, a plaintiff must show:

(1) the defendant sold goods to the plaintiff; (2) the seller made a statement of fact about the kind or quality of those goods; (3) the statement of fact was a material factor inducing the buyer to purchase the goods; (4) the goods did not conform to that statement of fact; (5) the nonconformity injured the buyer; and (6) the buyer notified the seller of the nonconformity in a timely fashion.

*Renaissance Leasing, L.L.C. v. Vermeer Mfg. Co.*, 322 S.W.3d 112, 122 (Mo. banc

---

10. While the extent of Nissan's knowledge of the defect over the class period is in dispute, it is undisputed that Nissan first launched an investigation into the dashboards beginning in the middle of 2006, and subsequently, corrective measures were implemented in the manufacturing process later that year. Nissan contends it did not become aware that the corrective measures had failed until later in early 2009, when it implemented a new manufacturing process and extended the warranty for the affected FX Vehicles.

11. It seems likely that there would be certain identifiable dates on which reports were made from dealers to Nissan in such a way that the policy—making management might have become aware of the existence of the bubbling defect as a problem for owners in the State of Missouri.

2010) (citing *Stefl v. Medtronic, Inc.*, 916 S.W.2d 879, 882–83 (Mo.App.1996); §§ 400.2–313(1)(a) and 400.2–313(2)).

In this case, the current owner list will include two types of owners: 1) those who bought the vehicle from Nissan originally and still own it; and 2) those who subsequently purchased the vehicle from the original owner. The difference is relevant because the second element of a cause of action for breach of express warranty is that Nissan made a statement of fact about the kind or the quality of the vehicle. It is not clear that privity can be found between Nissan and subsequent purchasers of used FX vehicles. It also is not clear that any statements of *fact* about the FX vehicle (as opposed to obvious puffery) were communicated to such subsequent purchasers by Nissan.

■■■ The Plaintiffs claim generally that statements regarding workmanship and quality of the FX Vehicles were made by Nissan in their marketing materials, brochures, catalogs, and advertisements. The third element of breach of express warranty requires the statements of fact made by Nissan to be material in inducing the buyer to purchase the goods. *See Renaissance Leasing*, 322 S.W.3d at 122. Missouri law is clear that while a brochure, catalog, or advertisement may constitute part of an express warranty, that catalog, advertisement, or brochure must have *at least* been read by the party claiming the express warranty. *Interco, Inc. v. Randustrial Corp.*, 533 S.W.2d 257, 262 (Mo. App.1976); *see also In re Bisphenol–A (BPA) Polycarbonate Plastic Prods. Liab. Litig.*, 687 F.Supp.2d 897, 906–07 (W.D.Mo.2009) (collecting case law, including *Interco*, standing for the proposition that for a representation to become part of the bargain, it must be known to all parties to that bargain and if one party is not aware of the statement, that party cannot

claim it was part of the bargain). Because each class member's claim for breach of express warranty would rely on an *individual determination* of whether they had in fact read or seen the marketing materials, brochures, catalogs, and advertisements that the Plaintiffs purport were a material factor in inducing each FX Vehicle owner into purchasing the car, the claims include an individual issue that predominates over the common issue of mere ownership. In addition, as we have noted, the putative class contains current owners who were secondary purchasers and never even had contact with any representative of Nissan or any of their advertising materials when purchasing the FX Vehicle.

Even if it were determined which individual class members had read the materials Nissan provided (which would involve several individual mini-trials), determining whether the goods conformed to Nissan's purported statement of fact regarding workmanship and quality is another individual issue. Even though there might be a latent defect present in the FX Vehicles' dashboards that makes them prone to bubbling in certain conditions, if this defect has not manifested itself, Plaintiffs must demonstrate the linkage between the latent defect and the purported injury.

■■■ In order to properly manage the predominance inquiry, we must understand the law with regard to claims under section 400.2–313(1)(a) for breach of express warranty. What we find is that the law of class actions is not particularly amenable to similar claims of damages for express warranty violations because the remedies for express warranty violations are so specifically prescribed by the Uniform Commercial Code. Accordingly, we must note the essentials of the claim for breach of express warranty in relation to the requirement that an alleged defect must have manifested itself.

■ "It is well established that purchasers of an allegedly defective product have no legally recognizable claim where the alleged defect has not manifested itself in the product they own." *O'Neil v. Simplicity, Inc.*, 574 F.3d 501, 503 (8th Cir. 2009) (quoting *Briehl v. General Motors Corp.*, 172 F.3d 623, 628 (8th Cir.1999)). "It is not enough to allege that a product line contains a defect or that a product is at risk for manifesting this defect; rather, the plaintiffs must allege that their product actually exhibited the alleged defect." *O'Neil*, 574 F.3d at 503–04; *see also Cole v. General Motors Corp.*, 484 F.3d 717, 729 (5th Cir.2007) (summarizing cases (including *Briehl*) that require such an allegation); *In re Canon Cameras*, 237 F.R.D. 357, 360 (S.D.N.Y.2006) (noting that proof of a malfunction is a prerequisite to any of plaintiffs' claims). "Where ... a product performs satisfactorily and never exhibits an alleged defect, no cause of action lies." *Briehl*, 172 F.3d at 628; *see Gentek Bldg. Prods. v. Sherwin–Williams Co.*, 2005 U.S. Dist. LEXIS 45312, 31–34 (N.D.Ohio Feb. 22, 2005) (collecting authorities from several jurisdictions standing for the proposition: "that a plaintiff has not suffered a present injury compensable in contract, express warranty, implied warranty, or tort until the very product in question has caused some harm to person or property, *even if the product in question contains a latent defect that has manifested in other, identical products*" (emphasis added)).

In *O'Neil*, the class representatives purchased a 3–in–1 crib, manufactured by Simplicity, for use by their grandchildren during family visits. 574 F.3d at 502. One side of the crib was a drop-side, making it easier to place or remove a child from the crib. *Id.* The named plaintiffs had used their crib without incident for four years. *Id.* In 2007, the Consumer Product Safety Commission ("CSPC") and Simplicity announced a voluntary recall of the crib

because a hardware defect made it possible for the drop-side to detach from the crib, creating a dangerous gap in which the child could get caught. *Id.* Simplicity refused to refund the price of the crib or repair the hardware defect but did offer to mail a retrofit repair kit at the consumer's request. *Id.* Once such a kit was installed, the drop-side would be affixed to the full-height position permanently, thereby disabling the functionality of the drop-side. *Id.* The plaintiffs stopped using the crib and did not request or install a retrofit repair kit. *Id.*

The named plaintiffs purported to represent a class of " 'all persons in Minnesota who purchased' a recalled Simplicity/Graco crib" (excluding any individual who suffered personal injury as a result of the allegedly defective crib). *Id.* at 503. The plaintiffs asserted eight claims against Simplicity, including claims for breach of express warranty, breach of implied warranty, unjust enrichment, and claims under three Minnesota consumer protection statutes. *Id.* Simplicity moved to dismiss, arguing the plaintiffs had not stated a claim because they failed to allege any injury as a result of the defect in the crib. *See id.* at 504. The plaintiffs maintained they did not receive the "benefit of the bargain" because they paid for a drop-side crib and now they cannot use the crib because it is not safe, and availing themselves of the retrofit kit would render the drop-side useless. *Id.* Thus, the plaintiffs claimed they suffered economic injury and sought damages for the difference in value between a crib with a functioning drop-side and one without. *Id.*

The *O'Neil* court, upholding the trial court's dismissal of the plaintiffs' case, found that "because the [plaintiffs'] crib ha[d] not exhibited the alleged defect, they ... received the benefit of their bargain," as the bargain "did not contemplate the

performance of cribs purchased by other consumers." *Id.* The court went on to explain that the remedies requested by the named plaintiffs and the putative class were contract remedies for what was really at its core a "no-injury products liability suit." *Id.* The plaintiffs characterized the suit in this fashion because "economic loss—the only loss that they could reasonably claim—is only 'recoverable in contract, if at all.' " *Id.* (internal citations omitted). However, Simplicity had not failed to deliver what was promised as "the [plaintiffs'] crib performs just as it was intended." *Id.* at 504–05. Thus, the case did not lend itself to contractual claims and instead rested in a traditional products liability no-injury case. *Id.* at 504. "No-injury suits such as this one, however, are routinely dismissed for failure to state a claim." *Id.* at 504–05 (citing a collection of cases finding an overwhelming majority of courts dismiss no-injury/unmanifested defect claims). Accordingly, the court found the plaintiffs suffered no injury and had no basis for relief.

Presumably there is a difference between *O'Neil* and this case in that people do not ordinarily buy cribs with the expectation that the crib will maintain a certain resale value, whereas people do often consider resale value in deciding on the purchase of a car. However, when we look to vehicle cases, it appears that the same principle shows up. In *Briehl*, the plaintiffs were a purported class of General Motors ("GM") car, truck, and SUV owners, who brought a class action against GM for breach of implied warranty, breach of express warranty, and violation of state consumer protection statutes, among other causes of action, for allegedly defective anti-lock braking systems ("ABS"). 172 F.3d at 625. The plaintiffs claimed damages for lost resale value and overpayment for the vehicles at the time of purchase

due to a defect with the ABS, termed the "pedal-to-the-floor phenomenon," that could cause drivers to misapply the brakes in emergency situations. *Id.* at 626. The plaintiffs insisted the presence of the faulty ABS units installed on their vehicles diminished the vehicles' resale value. *Id.* at 628. The plaintiffs did not allege the ABS was incapable of stopping the car or that the alleged defect violated any national safety standards. They did not allege in their complaint that the members of the purported class, or *any* member of the purported class, actually sold a vehicle at a reduced value because of the defect or the amount of their damages. *Id.* at 626, 628–29. The *Briehl* court upheld the trial court's dismissal of the case because the "[p]laintiffs [had] failed to allege that any defect had actually manifested itself in their vehicles, [and therefore] the [p]laintiffs' allegations of damages failed to meet the pleading requirements for defective products." *Id.* at 627. The court continued:

> The Plaintiffs' conclusory assertions that they, as a class, have experienced damages . . . are simply too speculative to allow this case to go forward. The Plaintiffs' assertion that their ABS-equipped vehicles are defective and that they have suffered a loss in resale value as a result of the defect is insufficient as a matter of law to plead a claim under any theory the Plaintiffs have advanced. Even construing all allegations in favor of the Plaintiffs, we find that the District Court was correct when it dismissed the Plaintiffs' Original Complaint for failure to state a claim.

*Id.* at 629.

As in *Briehl*, here the great majority of the putative class members have not actually experienced a bubbling problem with

their dashboard,[12] and it is not clear from the Plaintiffs' pleadings whether any of the Named Plaintiffs actually experienced bubbling with their FX Vehicle dashboard. The Plaintiffs also have not alleged any member of the purported class actually sold a vehicle at a reduced value. Indeed, the putative class is defined to include current owners, not former owners. Again, to determine which putative class members could even actually bring a cause of action for breach of *express warranty* would require *multiple individual determinations* of whether each member's dashboard had in fact bubbled and whether they were injured by that bubbling with a reduced resale price, if they sold the vehicle at all, or if the dashboard replacement was not covered by the warranty offered by Nissan.

Finally, in determining whether timely notice of the defect was provided to Nissan, the Plaintiffs allege the Named Plaintiffs and the Class Plaintiffs provided timely notice to Nissan regarding the defect in the FX Vehicles and that notice was received "in all instances by December 30, 2009," (which is the date Nissan was served with Plaintiffs' petition). Plaintiffs also try to address the notice requirement by stating that notice was unnecessary because Nissan itself acknowledged notice of the defect by sending notice out to all owners of the FX Vehicles affected.[13] If the alleged defect is that the FX Vehicles' dashboards "are prone" to bubbling, then this is a common question for all members. However, without manifestation of the actual dashboard bubbling, as opposed to a claim of injury from the stigma, the class members have not sustained any injury and they cannot meet the prima facie case

for class certification. *See Briehl,* 172 F.3d at 627–28.

While common issues do exist for the putative class's claim of breach of *express warranty,* the common issues certainly do not *substantially predominate over individual ones.* Determination of class membership in this case would require several individual inquiries into whether putative class members read the material distributed by Nissan, whether the defect in the dashboard actually manifested, whether the class member was damaged as a result, and whether the class member timely notified Nissan of the nonconformity. These are not simple questions that can be answered on a class-wide basis, as the same evidence will not suffice for each member to make a prima facie case. Instead, *individual* evidentiary determinations are required, defeating the purpose behind certifying the class action. We hold that the trial court abused its discretion in certifying a class for the breach of express warranty claim under Rule 52.08(b)(3).

### The Implied Warranty Violation Claims

The Plaintiffs also allege breach of implied warranty of merchantability against Nissan. The Plaintiffs claim the FX Vehicles sold by Nissan were not fit for their ordinary purpose because their dashboards were prone to bubbling. Specifically, the Plaintiffs allege the ordinary purpose for luxury vehicles, such as the FX Vehicles, includes not only transportation, but appearance and performance. Section 2–314 of the U.C.C. creates an implied warranty of merchantability, which warrants that goods must be at least "fit

---

**12.** As of the filing of this case, only 54 of 1,200 registered FX Vehicles in Missouri had received any type of dashboard repair or replacement.

**13.** We need not resolve the substantive law issue of whether Nissan's notice to the owners sufficed to meet the notice requirement for breach of express warranty.

for the ordinary purposes for which such goods are used." § 400.2–314(2)(c)[14]; *Renaissance Leasing*, 322 S.W.3d at 130. The implied warranty of merchantability does not mean a promise by the merchant that the goods are exactly as the buyer expected, but rather that the goods *satisfy a minimum level of quality*. *Skelton v. General Motors Corp.*, 500 F.Supp. 1181, 1191 (N.D.Ill.1980), *rev'd on other grounds*, 660 F.2d 311 (7th Cir.1981). To prove a claim for breach of implied warranty of merchantability in Missouri, a plaintiff must show:

> (1) that a merchant sold goods, (2) which were not "merchantable" at the time of the sale, (3) injury and damages to the plaintiff or his property (4) which were caused proximately or in fact by the defective nature of the goods, and (5) notice to the seller of the injury.

*Ragland Mills, Inc. v. General Motors Corp.*, 763 S.W.2d 357, 360 (Mo.App.1989). ▮▮▮▮ Most importantly, a plaintiff must prove that he or she was injured by the defective nature of the goods. *Renaissance Leasing*, 322 S.W.3d at 130; *Ragland Mills*, 763 S.W.2d at 360. The Plaintiffs claim the value of their FX Vehicles has been substantially diminished and they have "suffered a loss equal to the diminished value of the Subject Vehicle and/or the cost of replacing the defective dashboard." Once again, however, the Plaintiffs have not alleged any *actual manifestation* of a defect or instance of diminished resale value resulting from the alleged defect. Plaintiffs also fail to take into account that Nissan has already agreed in its extended warranty program to pay for, or reimburse the cost of, replacement or repair of any FX Vehicle dashboard damaged as a result of bubbling. Again, the law of class actions does not seem particularly accommodating to class claims for breach of implied

warranty where the defect is latent and potential. As alluded to in *Briehl* and *O'Neil*, and the numerous other cases cited therein, "unless there is actually a failure in product performance, there is no basis at all for claiming that the plaintiff has been damaged in any way." *Jarman v. United Indus. Corp.*, 98 F.Supp.2d 757, 768 (S.D.Miss.2000).

*Feinstein v. Firestone Tire & Rubber Co.*, 535 F.Supp. 595 (S.D.N.Y.1982), addressed a similar class certification quandary regarding a claim for economic damages arising out of a breach of implied warranty of merchantability, U.C.C. § 2–314. The case arose out of a series of failures of Firestone tires, which prompted a voluntary recall program of the tires in question by Firestone. *Id.* at 597. The plaintiffs sought to certify a class of persons and entities who owned either Firestone 500 steel-belted radial tires ("Firestone 500's") or Firestone TPC steel-belted radial tires ("Firestone TPC's"), and asserted only a claim for "economic damages" resulting from a breach of implied warranty of merchantability—no claims for death, injury, or accident-related property damage. *Id.* at 598–99. The class, as defined, consisted of over 12,000,000 putative class members. *Id.* at 599. The plaintiffs claimed that the Firestone 500's and TPC's were not merchantable or fit for their intended purpose and as a result of their defective conditions, "the plaintiffs and the [c]lass *have suffered or will suffer* blowouts, tread separation and chunking, steel belt separation, or shifting, bead distortion, sidewall blisters and cracks, and out of round conditions." *Id.* at 601 (emphasis added). Firestone challenged certification, contending common questions of law or fact

---

**14.** The language of § 400.2–314 RSMo and U.C.C. 2–314 is identical.

*did not* predominate over individual questions. *Id.*

The court agreed with Firestone. Firestone had offered credible evidence that a majority of the tires in question had in fact remained failure free throughout the time they were used, and many of the plaintiffs whose depositions had been taken acknowledged their Firestone tires led "full and uneventful lives." *Id.* While the plaintiffs contended that all the Firestone tires contained common defects and therefore a purchase of a defective tire, *ipso facto*, caused an economic loss, the court rejected that contention, finding no persuasive authority supporting that position. *Id.* at 602. Instead, the court noted that tires that did not exhibit the defect were (by demonstration and definition) fit for their ordinary purpose, and hence merchantable, under U.C.C. 2–314, and no cause of action for breach of implied warranty can arise. *Id.* ("Liability does not exist in a vacuum; there must be a showing of some damage . . . ."). The court found that the majority of tires lived up to the "minimum level of quality," which is all U.C.C. 2–314(2)(c) requires and "[p]laintiffs' bald assertion that a 'common' defect which never manifests itself 'ipso facto caused economic loss' and breach of implied warranty is simply *not* the law." *Id.* at 603 (emphasis added).

The *Feinstein* court finally concluded that common questions of law or fact did not, in fact, predominate under plaintiffs' allegations of "common defects" and that certification was improper. *Id.* In pertinent part, the court stated:

> Since it appears that the majority of the putative class members have no legally recognizable claim, the action necessarily metastasizes into millions of individual claims. That metastasis is fatal to a showing of predominance of common questions. Those class members whose tires had performed as warranted would have to be identified and eliminated from the action. Myriad questions would confront the survivors, including the manner in which the alleged breach of warranty manifested itself, and other possible causes of the problem encountered. This situation simply does not lend itself to class treatment.

*Id.*

The same situation arises with the putative class of FX Vehicle owners here. The Plaintiffs here, like the plaintiffs in *Feinstein*, essentially claim that a purchase of FX Vehicles, *ipso facto*, caused an economic loss. We find no authority, in Missouri or otherwise, for this proposition. Plaintiffs admit, and Nissan does not dispute, that a large portion of the putative class is comprised of individuals who have not had any dashboard bubbling manifest in their FX Vehicles. Like the tires in *Feinstein*, which were found merchantable and fit for their ordinary purpose because they had exhibited no actual defect, the FX Vehicles' dashboards which have not exhibited any bubbling or other problems have lived up to the "minimum level of quality" required by 400.2–314(2)(c). Thus, those dashboards are fit for their ordinary purpose, merchantable, and no cause of action for breach of implied warranty can arise, as there must be some showing of damage. *See O'Neil*, 574 F.3d at 503–05; *Briehl*, 172 F.3d at 627–29; *Feinstein*, 535 F.Supp. at 603.

Because it appears a majority of the putative class members here have no breach of implied warranty claim, the action in reality becomes hundreds or thousands of individual claims. Class membership would require *individual determinations* of whether each putative class member actually experienced manifestation of the bubbling defect, so as to be able to maintain a cause of action for

breach of implied warranty of merchantability, and then subsequently, individual inquiries into the extent of damage sustained, whether the alleged defect was the cause in fact or proximate cause of the damage sustained, and finally whether each individual class member notified Nissan. The overwhelming requirement of individual determinations is fatal to a showing of predominance of common questions. As a result, we find the trial court abused its discretion in certifying a class for the breach of implied warranty of merchantability claim under Rule 52.08(b)(3).

### Summary

For the foregoing reasons, we conclude that the trial court did not abuse its discretion in certifying a class as to plaintiffs' claims under MMPA because class treatment could reasonably be viewed as a superior means of adjudicating such claims. Because Nissan's conduct is the focus on many of the MMPA claims, common issues substantially predominate over individualized ones, and the court did not abuse its discretion in certifying the class. As for the claims of breach of express and implied warranty, however, there is not a predominance of commonalities. For the reasons discussed above, we determine that class treatment in this case is a less-than-superior method of adjudication for these claims. We therefore hold that the trial court abused its discretion in finding the predominance requirement satisfied for class certification regarding the Plaintiffs' claims for breach of express warranty and breach of implied warranty of merchantability, because individual issues substantial predominate over common ones.

### Ruling

In this interlocutory appeal, the trial court's class certification order is affirmed as to the class certification of the MMPA claims and reversed as to the certification of the claims for breach of express warranty and breach of implied warranty of merchantability. On remand for further proceedings, the trial court shall de-certify the class treatment as to express and implied warranty claims. The trial court is also directed to strike the portion of the certification order requiring Nissan to provide assistance or counsel as to the proposed class definition or any refinements therein.

All concur.